IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

THINH LUONG,                          )     CIVIL 16-00613 LEK-KSC
                                      )
          Plaintiff,                  )
                                      )
     vs.                              )
                                      )
FRANCIS SEGUEIRA, in his              )
Official Capacity only as             )
Warden of Oahu Community              )
Correctional Center, ACO PAT          )
SOOALO, AND JOHN DOES 1-5,            )
                                      )
          Defendants.                 )
_____        )


**OUTLINE OF DECISION**

          This matter came on before the Court for a bench trial
On June 5, 2018.  John Rapp, Esq., appeared on behalf of
Plaintiff Thinh Luong ("Plaintiff" or "Luong").  John Cregor,
Jr., Deputy Attorney General, appeared on behalf of Defendant Pat
Sooalo ("Defendant" or "Sooalo").  The Court, having considered
the pleadings filed herein and the testimony given at trial,
including the witnesses' declarations, and having an opportunity
to judge the credibility of the witnesses, to examine the
exhibits admitted into evidence and to consider the arguments and
representations of counsel, pursuant to Federal Rule of Civil
Procedure 52, makes the following Findings of Fact and
Conclusions of Law and Order, and FINDS in favor of Plaintiff and
AWARDS the amount of **$5,000.00** in general damages and the amount
of **$25,000** in punitive damages.  The Court also concludes that

Plaintiff is entitled to an award of reasonable attorney's fees and costs incurred, to the extent permissible by law.  Plaintiff shall, in strict compliance with Rule LR54.3 of the Local Rules of Practice of the United States District Court for the District of Hawai`i ("Local Rules"), submit his motion for attorney's fees and costs, with supporting documentation, according to the deadlines set forth in Local Rule 54.3 and the other applicable legal authorities.  Plaintiff's motion for attorney's fees and costs will be referred to the magistrate judge, pursuant to Local Rule 54.3(h).

Any finding of fact that should more properly be deemed a conclusion of law and any conclusion of law that should more properly be deemed a finding of fact shall be so construed.

Plaintiff, as the prevailing party, shall prepare his proposed Findings of Facts and Conclusions of Law ("FOFCOL") based on the Court's Outline of Decision ("Outline") and provide page and line notations for the findings of fact from the official court transcript or other citations to the trial record. Plaintiff's proposed FOFCOL is due by **October 19, 2018**. Defendant shall prepare his objections, if any, to Plaintiff's proposed FOFCOL, together with and Defendant's proposed FOFCOL based on the Court's Outline, by **October 31, 2018**.  Thereafter, the Court will issue its FOFCOL, Order and Judgment in the case.

**BACKGROUND**

The facts of this action involve an incident which occurred on December 21, 2015 when Defendant, while employed by the State of Hawai`i, in the Department of Public Safety ("DPS"), as an Adult Correction Officer ("ACO") at the Oahu Community Correctional Center ("OCCC"), entered a prison cell where Plaintiff was located. Subsequently, Plaintiff sustained physical and emotional injuries.

## I. Findings of Fact

1. Plaintiff was an incarcerated person at OCCC on December 21, 2015.

2. At the time of his incarceration, Plaintiff was residing at OCCC in Module 17, Cell 111 with John Silva ("Mr. Silva") and another roommate. [Tr. Exh. D-9 (photograph of Cell 111 front door).]

3. The layout of Cell 111 is depicted in two diagrams. [Tr. Exh. D-8 (two floor plan diagrams).] This cell contains a toilet which is affixed to the floor and located next to the door at the entrance of Cell 111, bunk beds, which are located directly across the door at the entrance, and a sink/desk located in between the toilet and the bunk beds. [Tr. Exhs. D-8, D-10 (photograph of bunk beds from entrance to cell).]

4. On December 21, 2015, Defendant was employed by DPS and on duty at OCCC as an ACO.

3

5.    On December 21, 2015, Plaintiff arrived by
ambulance at The Queen's Medical Center ("QMC") Emergency
Department ("ED") at 4:06 p.m.  [Tr. Exh. P-1 (excerpts of
Plaintiff's medical records) at SOHM 0096.]  The chief complaint
was that "Patient presents with Assault, Physic. OCCC; mod
trauma," and the history taken was that:

> This is a 49 year old male with no known past
> medical history who presents to the ED via for
> evaluation of an assault.  This patient was found
> down in his cell after an altercation occurred at
> OCCC.  The patient was not responding to questions
> appropriately during his interview, but there is a
> known language barrier the patient primarily
> speaks Vietnamese.  According to the prison
> guards, the patient and some of the other inmates
> apparently smoked spice prior to the altercation.
> He was given Narcan en route.  Further history
> cannot be obtained due to the acuity of the
> patient's condition.

[Id.]  Plaintiff had a laceration to his left forehead, which was
repaired with sutures.  [Id. at SOHM 0097.]  Examination,
including x-rays, resulted in the following findings:

> 1.    Acute to subacute appearing right 10th rib
> fracture deformity with subacute appearing right
> 11th rib fracture deformity.
>
> 2.    Otherwise no evidence of traumatic injury to
> the abdomen or pelvis.
>
> 3.    Small hiatal hernia and other incidental
> findings as described.

[Id. at SOHM 0101 (emphases omitted).]  The physician's summary
of medical care and patient assessment included, in relevant
part, as follows:

ED Course/Medical Decision Making:
MDM

This is a 49 year old year old [sic] male with a
past medical history as described above who
presents to the ED for evaluation of an assault.

On physical exam, the patient was initially
tachycardic.  Otherwise, the cardiopulmonary exam
is unremarkable.  Abdomen is soft, non-distended,
non-tender.  There is small 1 cm laceration to the
left superior forehead.  The patient appears
intoxicated.

My differential diagnosis in this patient
includes, but it not limited to subsequent
intoxication, head contusion versus intracranial
hemorrhage.

I have reviewed the patient's past medical record
and see that this patient has not been seen at
Queen's Medical Center previously.

Because the risk of possible life threatening
illness, further emergency evaluation and
management were indicated.

Laboratory studies were reviewed by me.  CBC shows
a leukocytosis of 11.1 but with no left shift.
BMP was unremarkable.

Imaging studies were review by me as above.  CT of
the abdomen and pelvis revealed subacute fractures
of the ribs 10 and 11 on the right side.

[Id. at SOHM 0103.]  The clinical impression was "[a]ssault by

bodily force by person unknown to victim (primary encounter

diagnosis)."  [Id.]

6.  On October 10, 2016, Plaintiff filed his Complaint

against Defendant Francis Segueira, in his Official Capacity only

as Warden of Oahu Community Correctional Center ("Defendant

Segueira"), in the First Circuit Court of the State of Hawai`i.

The Complaint was removed to federal court on November 16, 2016. [Notice of Removal, dkt. no. 1, Exh. A (Complaint).] Plaintiff's Complaint alleged five claims: Count I (assault), Count II (a 42 U.S.C. § 1983 claim), Count III (battery), Count IV (gross negligence and/or wilful, wanton misconduct), and Count V (injunctive relief).

7. Plaintiff's First Amended Complaint was filed on July 17, 2017 against Defendants Segueira and Sooalo, and it alleges the same five claims alleged in the original Complaint. [Dkt. no. 20.]

8. This Court approved the parties' stipulation to dismiss Defendant Segueira on May 31, 2018. [Dkt. no. 107.]

9. A non-jury trial was held on June 5, 2018 as to Plaintiff's claims against Defendant on the First Amended Complaint's Counts I through IV. Count V has been dismissed since that claim for relief was alleged only as to Defendant Segueira, who was dismissed by stipulation prior to trial.

10. Plaintiff testified at trial that the following occurred on December 21, 2015:

a. An individual by the name of "Sonny Jackson" ("Mr. Jackson") came into his cell to talk story, and Plaintiff sat in the cell with Mr. Jackson and Mr. Silva.

b. He was sitting on the toilet, Mr. Silva was sitting in the chair which was in front of the sink, and

Mr. Jackson was sitting between the toilet and the door to the cell.

        c.    No one in the cell was smoking "spice" or "tea bags," nor did they have any contraband.

        d.    Defendant was in the hallway outside of Plaintiff's cell and was walking up and down the hallway. Plaintiff was inside his cell with Mr. Jackson and Mr. Silva, and Plaintiff swore at Defendant by saying, "Fuck you," or "Asshole, better get the hell out of here."

        e.    Plaintiff speaks with an accent and believes that Defendant recognized his accent and knew that it was Plaintiff who swore at Defendant.

        f.    Plaintiff and Mr. Silva swore at Defendant. Plaintiff did so because Defendant was walking up and down the hallway in front of his cell and was looking inside the cell as if he was suspicious of Plaintiff doing something in the cell.

        g.    After Plaintiff swore, Defendant went away for a little while and then came back. Plaintiff swore at him again. The swearing made Defendant very mad. Defendant came into the cell, grabbed Plaintiff and hit him.

        h.    After being struck by Defendant, Plaintiff was "knocked out" and became unconscious. He does not remember anything until he regained consciousness and found himself in QMC

as a patient. A nurse told Plaintiff that he had been beaten by a guard.

11. Plaintiff testified that he is currently homeless and unemployed.

12. Defendant testified that the following occurred on December 21, 2015:

       a. Plaintiff never tried to assault or harm him.

       b. There was no justification for him to use any kind of force on Plaintiff.

       c. He approached Cell 111 because he could smell smoke from where he was standing and went down to the bottom tier to follow the scent, which led him to Plaintiff's Cell 111.

       d. The door to Cell 111 was closed.

       e. He thought the smell of smoke came from fire, and inmates are not allowed to have fire nor matches nor lighters in the cells. These would be violations of the OCCC rules.

       f. He did not call for backup, but he went up to the cell, opened the door and saw a lot of inmates in Cell 111. A few inmates left, and there were three remaining – Plaintiff, Mr. Silva and Mr. Jackson.

       g. He went into Cell 111 and observed Plaintiff, Mr. Jackson and Mr. Silva with their eyes rolled back, and they were unresponsive to any commands or questions that he asked. There was a strong odor of smoke in the cell.

h.    He thought at the time that the inmates had been smoking something because of the strong odor and what he saw in the toilet.  Initially, he thought they were smoking spice because of the inmates' reaction, and that would be an OCCC rule violation.

i.    He determined that the situation definitely was one in which he should call for medical backup, and he did so by verbally calling to his partner who was up on the control station.  His partner was "Valador."

j.    At the time he called for backup, the door was closed because when he entered the cell, the door just shuts on its own.  Later in his trial testimony, he stated that the cell door closes automatically "probably for the first few inches but anything more than that it just stays open."  There is no closing mechanism.

h.    He had to come out of the cell to tell Valador to call for module lock down.

i.    He did not tell Valador to call for medical backup when he first came out of the cell after concluding that the inmates needed medical help.  He called for medical backup only after he left to get gloves because he needed to assess the situation a little bit more.

j.    He was getting the gloves to preserve what the inmates had been smoking and which was in the toilet.  He was

not able to obtain what was in the toilet because he could not get to it, and he does not know what happened to whatever was in the toilet. At first, the item was floating in the toilet, but it got wet and probably sunk to the bottom of the toilet. It would have been appropriate procedure to try to preserve the item to see if it was contraband or spice, but he could not get to it, and the item is gone.

k.   During module lock down, all inmates have to get back into their cells and are locked in their cells. He believes that Valador did lock down the module.

l.   He put on the gloves, then told Valador to call medical backup and turned around and went back to the cell. He is not sure if Valador called for medical backup at that time. To do so, you need to get on the security radio and call central control.

m.   He puts on gloves for everything; "just going in the cell in general," but he did not put on gloves before he went into Cell 111 the first time. His reason for putting on the gloves later was his intention to reach into the toilet.

n.   He went back into Cell 111 before backup arrived and tried to assist the three inmates. Mr. Jackson fell on Plaintiff. Defendant tried to get them "situated" and stepped back, then Mr. Silva attacked him.

o.  Before the attack, Mr. Silva was sitting on
the toilet to his left, Mr. Jackson was standing "somewhat in
front of the door by the wall," and Plaintiff was "sitting on the
chair next to the sink, right in front of the sink."  He saw
Mr. Silva on the toilet, fully clothed, and he could see through
Mr. Silva's legs and inside the toilet, where something was
burning.  Before Mr. Silva attacked him, Plaintiff hit the floor.

p.  Mr. Jackson fell on Plaintiff, and then
Plaintiff fell to the floor.  Defendant took time to turn
Plaintiff over before he called for backup and put gloves on.
Defendant was not wearing gloves at the time he turned Plaintiff
over on the floor of the cell.  In the Incident Report,
Defendant's statement contradicted his trial testimony in stating
that he flipped Plaintiff over only after Mr. Jackson and
Mr. Silva were taken out of the room.  [Tr. Exh. J-2 (Incident
Report dated 12/21/15, bates stamped SOHI 0016 ("12/21/15
Statement")).]  He testified that he was distraught, tired and
fatigued when he wrote that report because he just got stabbed,
and he did not even remember Plaintiff being there.  He was
focused on Mr. Silva.

q.  As a result of being stabbed, he received
worker's compensation and was on leave.  Defendant returned to
work about eleven months to a year later and received full pay.

r.  Defendant is 6 feet 5 inches tall and weighs 410 pounds.  His yearly earnings in 2015 was probably $50,000, and it is a little bit higher in 2018.

13.  The Court finds Defendant's testimony about the events on December 21, 2015 is not credible.  He directly contradicted the sequence of events which he detailed in his 12/21/15 Statement, which was prepared on the same day and within hours after the incident occurred.  Although leeway may be given in light of Defendant's state of mind after being stabbed by Mr. Silva, his version of the events still defies common sense. He wrote in the 12/21/15 Statement, which was part of an Incident Report for his employer:

> Inmate Jackson fell over facing down onto the
> lap of Inmate Luong.  I then helped Inmate
> Jackson onto the floor and layed (sic) him on
> his back.  After Inmate Jackson and Silva was
> taken out of the room I found Inmate Luong
> faced down on the floor when I went back to
> check on him.  I then flipped Inmate Luong
> over on his back and found his face covered
> with blood.

[Tr. Exh. J-2.]  This is significantly different from his trial testimony, where there are also contradictions with and between testimony given on direct and cross examinations.  In his direct examination, given by written declaration, he stated:

> 10.  While I stood there, inmate Jackson fell over
> face down onto the lap of inmate Luong.  I then
> helped Jackson onto the floor and rolled over
> Luong who had fallen from his chair.  When I
> rolled Luong onto his back, I noticed some blood
> on this face.

12

11. Based upon the fact that all three men in the cell were in some sort of stupor and the smell of the smoke, together with my training and experience, I strongly suspected that the three inmates had been smoking "spice."

12. I then left the cell and walked over to the control booth which was quite close. I then:

    a. obtained a pair of latex gloves so that I could try to retrieve the contraband from the toilet,

    b. called for backup, which is normal procedure, and

    c. called for lockdown, which is also normal procedure. Lockdown means that each inmate must return to his call and the doors are locked. This is always done to respond to an inmate infraction of the rules.

13. I next returned to Cell 111, wearing latex gloves. When I first opened the door, everything seemed the same as I had left it a minute or so earlier. The contraband was still burning in the toilet. As I stepped inside, suddenly inmate Silva started to violently attack me, first with his fists and then with a "shank", a piece of wood with a nail sticking out of it apparently torn off the sink counter. I concentrated on defending myself from Silva's attack and did not really look at the other two inmates. The last time that I had noticed them they appeared to still be in a stupor. Fortunately, ACO Anthony Marcus entered the cell as backup and helped me try to subdue Silva. Before we succeeded in subduing inmate Silva, two other ACO's, Gavin Mew and Levi Kaakau, had also entered cell 111. I can say for myself that I was concentrating on defending myself from Silva and, other than to roll over Luong did not touch him again.

[Tr. Exh. D-1 (Decl. of Pat Sooalo dated 5/31/18 ("Sooalo Decl.")) at ¶¶ 10-13.]

13

14.  On cross examination, Defendant testified that: he saw Mr. Silva on the toilet, Mr. Jackson "was standing somewhat in front of the door by the wall"; Plaintiff was sitting on the chair "right in front of the sink"; Mr. Jackson fell on Plaintiff; and, as Defendant was trying "to get them situated," he stepped back and Mr. Silva attacked him.  He acknowledged that his trial testimony contradicts his 12/21/15 Statement. Defendant testified it was a mistake in his statement when he said that it was after Mr. Jackson and Mr. Silva were taken out of the room that he flipped Plaintiff over.

15.  On redirect examination, Defendant testified that he stands by his testimony given in his declaration, namely that: he helped Mr. Jackson and flipped Plaintiff over on his back; he left Cell 111 to get gloves; and Mr. Silva attacked him when he returned to Cell 111.  [Sooalo Decl. at ¶¶ 10, 12-13.]  This testimony contradicts the sequence of events recounted in his 12/21/15 Statement in which he stated that he found Plaintiff on the floor only after Mr. Jackson and Mr. Silva were taken out of Cell 111.  [Tr. Exh. J-2.]  Both of these accounts conflict with the scenario Defendant gave on cross examination which was that: he entered Cell 111 because he smelled smoke coming from the cell; he saw Mr. Jackson fall on top of Plaintiff's lap; Plaintiff fell to the floor; and Defendant tried to situate them, but Mr. Silva attacked him.

16.   Given the small dimensions of Cell 111, if
Defendant's testimony is to be believed, then Mr. Jackson was
standing "somewhat in front of the door and by the wall."  When
Mr. Jackson fell forward, it would be more likely than not that
he would have fallen on top of or near Mr. Silva (not Plaintiff)
because the toilet is located right next to the door and opposite
the wall by which Mr. Jackson was supposedly standing.  Then, it
would be more likely than not that Plaintiff did not fall to the
floor as Defendant testified.

17.   Alternatively, if Mr. Jackson was standing by the
wall but not, as Defendant testified, by the door and instead was
standing closer to the bunk beds, then, when Mr. Jackson fell, it
would be more likely than not that Mr. Jackson would have fallen
toward the vicinity of the sink and onto Plaintiff, if Plaintiff
was indeed sitting on a chair in front of the sink, as Defendant
testified, and not sitting on the toilet, as Plaintiff testified.
It would be more likely than not that, if Mr. Jackson had fallen
onto Plaintiff's lap and Plaintiff consequently fell from the
chair (as Defendant testified), Plaintiff would have fallen at
least partially on top of Mr. Jackson's body, thereby cushioning
Plaintiff's contact with the floor or that Mr. Jackson's body
weight on top of Plaintiff would have slowed down Plaintiff's
fall to the floor.  It would be more likely than not, under
either of these scenarios, that Plaintiff's fall would not likely

have been violent enough to cause a laceration to his scalp on the **left side** of his face and two subacute fractures of his tenth and eleventh ribs on the **right side** of his body.

18. Plaintiff's testimony that he was sitting on the toilet at the time that Defendant entered Cell 111 and assaulted him credibly explains the laceration to the left side of his face and the two fractures of his ribs on the right side of his body.

19. Defendant called Maureen Camacho, R.N. ("Nurse Camacho") as a witness. Her direct testimony was submitted by declaration. [Tr. Exh. D-5 (Decl. of Maureen Camacho, R.N. ("Camacho Decl.")).] Relevant to the issues at hand, her testimony was that: she is an employee of the State of Hawai`i, DPS; on December 21, 2015, she was part of a team of medical personnel "called to Module 17 of OCCC to assist certain inmates and arrived at 3:15 p.m."; upon her arrival, she observed that Mr. Jackson "was laying face-down, handcuffed, and was yelling and screaming, with ACOs Sooalo and Purcel tending to him"; Mr. Silva "was also laying on the floor being tended to by an ACO and being assessed" by a nurse; Plaintiff "was inside Cell 11 . . . flat on his back on the floor with small to moderate amount of blood to the left side of his head"; Plaintiff "appeared to be awake but was not responding to verbal commands"; and Plaintiff's "pupils were dilated to 5mm." [Id. at ¶¶ 1, 4(a)-(c).]

20.    Defendant called Caroline Mee, M.D. as a witness,
but Dr. Mee did not provide any relevant admissible testimony.
[Tr. Exh. D-2 (Decl. of Caroline M. Mee, M.D., dated 12/28/17,
admitted in part).]

21.    Defendant called Courtney Mori, R.N. ("Nurse
Mori") as a witness.  His direct testimony was presented by
declaration.  [Tr. Exh. D-4 (Decl. of Courtney Mori, R.N., dated
May 2018, admitted in part).]  Relevant to the issues at hand,
his testimony deemed admissible by the Court was that: on
December 21, 2015, he was called to Module 17 of OCCC as part of
a team of medical personnel "where it was reported that multiple
inmates had altercations while under the use of spice"; Plaintiff
"became violent at times"; and "[a]ll inmates were taken by
ambulances to Queen's Medical Center."  [Id. ¶¶ 4-6.]  On cross
examination, he testified that Plaintiff "was uncooperative to
verbal commands and drifting in and out of consciousness."
Plaintiff was also a little pale and sweaty; could not recall his
name; and could not stay still, and this is what he meant in his
declaration that Plaintiff "became violent at times."

22.    Nurse Camacho and Nurse Mori's testimonies are
consistent with Plaintiff's testimony that he was assaulted and
QMC Emergency Department's clinical impression of "[a]ssault by
bodily force by person unknown to victim (primary encounter
diagnosis)."  [Tr. Exh. P-1, at SOHM 0103.]

17

## II.  Conclusions of Law

### A.  Jurisdiction

1.  Although Plaintiff has brought several state law claims in his action, this Court may exercise jurisdiction over all of Plaintiff's claims because:

> Federal courts may exercise federal-question jurisdiction over an action in two situations. First, and most commonly, a federal court may exercise federal-question jurisdiction if a federal right or immunity is "'an element, and an essential one, of the plaintiff's cause of action.'"  Franchise Tax Bd. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 11, 103 S. Ct. 2841, 77 L. Ed. 2d 420 (1983) (quoting Gully v. First National Bank, 299 U.S. 109, 112, 57 S. Ct. 96, 81 L. Ed. 70 (1936)).  Thus, the federal question on which jurisdiction is premised cannot be supplied via a defense; rather, the federal question must "be disclosed upon the face of the complaint, unaided by the answer."  Phillips Petroleum Co. v. Texaco, Inc., 415 U.S. 125, 127–28, 94 S. Ct. 1002, 39 L. Ed. 2d 209 (1974) (per curiam).  Second, a federal court may have such jurisdiction if a state-law claim "necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally-approved balance of federal and state judicial responsibilities."  Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 314, 125 S. Ct. 2363, 162 L. Ed. 2d 257 (2005). . . .

Provincial Gov't of Marinduque v. Placer Dome, Inc., 582 F.3d 1083, 1086 (9th Cir. 2009) (some alterations in Marinduque).

2.  The Court concludes Plaintiff's cause of action pursuant to 42 U.S.C. § 1983 supports federal question jurisdiction.

3.	This Court also concludes that it has supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367(a).

B.	**Burden of Proof**

1.	Plaintiff has brought a civil action against Defendant and, as the party seeking relief, has the burden of proving his claims and amount of damages.  See <u>Tourgeman v. Nelson & Kennard</u>, 900 F.3d 1105, 1109 (9th Cir. 2018) ("It is one of the most basic propositions of law . . . that the plaintiff bears the burden of proving his case, including the amount of damages.'" (alteration in <u>Tourgeman</u>) (citation and internal quotation marks omitted)).

2.	There can be different standards of proof depending on the claim asserted:

> The purpose of a standard of proof is "to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." <u>In re Winship</u>, 397 U.S. 358, 370 (1970) (Harlan, J., concurring). Three standards of proof are generally recognized, ranging from the "preponderance of the evidence" standard employed in most civil cases, to the "clear and convincing" standard reserved to protect particularly important interests in a limited number of civil cases, to the requirement that guilt be proved "beyond a reasonable doubt" in a criminal prosecution. <u>See Addington v. Texas</u>, 441 U.S. 418, 423-424 (1979).  This Court has, on several occasions, held that the "clear and convincing" standard or one of its variants is the appropriate standard of proof in a particular civil case. <u>See Addington v. Texas</u>, *supra*, at 431 (civil commitment); <u>Rosenbloom v. Metromedia,</u>

19

> Inc., 403 U.S. 29, 52 (1971) (libel); Woodby v.
> INS, 385 U.S. 276, 285 (1966) (deportation);
> Chaunt v. United States, 364 U.S. 350, 353 (1960)
> (denaturalization); Schneiderman v. United States,
> 320 U.S. 118, 159 (1943) (denaturalization).
> However, the Court has never required the "beyond
> a reasonable doubt" standard to be applied in a
> civil case. "This unique standard of proof, not
> prescribed or defined in the Constitution, is
> regarded as a critical part of the 'moral force of
> the criminal law,' In re Winship, 397 U.S., at
> 364, and we should hesitate to apply it too
> broadly or casually in noncriminal cases."
> Addington v. Texas, *supra*, at 428.

California ex rel. Cooper v. Mitchell Bros.' Santa Ana Theater,

454 U.S. 90, 92–93 (1981) (per curiam) (footnote omitted).

    3.    "When a district court . . . hears state law

claims based on supplemental jurisdiction, the court applies

state substantive law to the state law claims." Mason & Dixon

Intermodal, Inc. v. Lapmaster Int'l LLC, 632 F.3d 1056, 1060 (9th

Cir. 2011). Therefore, Hawai`i law regarding the applicable

burden of proof applies to Plaintiff's state law claims.

    4.    "Preponderance of the evidence is defined as

'proof which leads the jury to find that the existence of the

contested fact is more probable than its nonexistence.'" Coyle

v. Compton, 85 Hawai`i 197, 202, 940 P.2d 404, 409 (Ct. App 1997)

(quoting Commentary to HRE Rule 304).

    5.    Clear and convincing evidence is defined as:

> [A]n intermediate standard of proof greater
> than a preponderance of the evidence, but
> less than proof beyond a reasonable doubt
> required in criminal cases. It is that
> degree of proof which will produce in the

> mind of the trier of fact a firm belief of
> conviction as to the allegations sought to be
> established, and requires the existence of a
> fact be highly probable.

Id. at 203, 940 P.2d at 410 (quoting Masaki v. General Motors
Corp., 71 Haw. 1, 15, 780 P.2d 566, 574-75, *reconsideration
denied*, 71 Haw. 664, 833 P.2d 899 (1989)).

      6.   For Counts I (assault) and III (battery),
Plaintiff has brought civil claims, and the burden of proof is
bySeptember 27, 2018 a preponderance of the evidence.  See
generally Sam v. Keliihoomalu, 24 Haw. 477 (1918).

      7.   For Count II (§ 1983 claim), the burden of proof
is by a preponderance of the evidence.  See Dias v. Elique, 436
F.3d 1125, 1129 (9th Cir. 2006) (noting the appellants were
required to prove their § 1983 claim by a preponderance of the
evidence).

      8.   For Count IV (gross negligence and/or willful or
wanton conduct), the burden of proof is by clear and convincing
evidence.  See Iddings v. Mee-Lee, 82 Hawai`i 1, 14, 919 P.2d
263, 276 (1996) ("[W]e hold that claims based on wilful and
wanton misconduct must be proven by clear and convincing
evidence.").

**C.**  **Substantive Claims (Counts I-V)**

      1.   The elements of Plaintiff's assault claim
(Count I) are: "A person commits the common law tort of assault
if he or she acts with intent to cause another a nonconsensual

harmful or offensive contact or apprehension thereof, and the other person apprehends imminent contact." <u>McCormack v. City & Cty. of Honolulu</u>, 762 F. Supp. 2d 1246, 1253 (D. Hawai`i 2011) (citation omitted).

2.    Based on the testimonies of Plaintiff, Nurse Camacho and Nurse Mori, and QMC Emergency Department medical records, [Tr. Exh. P-1,] the Court concludes Plaintiff has proven by a preponderance of the evidence that Defendant intended to strike Plaintiff on December 21, 2015 with the intent to cause him physical harm and that Defendant placed Plaintiff in apprehension of imminent contact.

3.    The Court concludes that Plaintiff met his burden of proof by a preponderance of the evidence and thus prevails on his assault claim (Count I).

4.    Section 1983 provides relief against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Parties can seek relief under § 1983 against persons acting under the color of state law. <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988). "Persons" include "state and local officials sued in their individual capacities, private individuals and entities which acted under color of state law, and local

governmental entities." <u>Vance v. Cty. of Santa Clara</u>, 928 F.
Supp. 993, 995-96 (N.D. Cal. 1996).

5. For an individual capacity suit under § 1983, a
plaintiff must establish personal participation in the alleged
constitutional violation on the part of the individual to subject
that person to individual liability. <u>Jones v. Williams</u>, 297 F.3d
930, 934 (9th Cir. 2002).

6. Plaintiff's burden of proof is:

> To prevail on a § 1983 claim, a plaintiff
> must prove by a preponderance of evidence (1) that
> a right secured by the Constitution or laws of the
> United States was violated, and (2) that the
> alleged violation was committed by a person acting
> under the color of state law. <u>Long v. Cnty. of
> Los Angeles</u>, 442 F.3d 1178, 1185 (9th Cir. 2006)
> (elements of § 1983 claim); <u>Dias v. Elique</u>, 436
> F.3d 1125, 1129 (9th Cir. 2006) (a plaintiff must
> prove § 1983 claim by a preponderance of
> evidence).

<u>Prison Legal News v. Columbia Cty.</u>, 942 F. Supp. 2d 1068, 1080
(D. Or. 2013).

7. The Court concludes that Plaintiff has proven by a
preponderance of the evidence that Defendant was a state actor
and was acting under the color of state law at all relevant times
on December 21, 2015.

8. Plaintiff brings Count II pursuant to § 1983, and
alleges, in pertinent part, in the First Amended Complaint:

> The conduct of [Defendant] . . . deprived
> Plaintiff of Plaintiff's right not to be subjected
> to cruel or unusual punishment as secured to the
> Plaintiff under the Eighth Amendment to the United

States Constitution (Art. VIII, U.S.
Constitution), and of Plaintiff's right not be to
be deprived of life, liberty, or property without
due process of law under the Fourteenth Amendment
to the Untied States Constitution (Art. XIV, U.S.
Constitution) . . . .

[First Amended Complaint at ¶ 19.]

9.    In analyzing a claim of excessive force in violation of the Eighth Amendment prohibition against cruel and unusual punishment, the Court must conduct the "core judicial inquiry" as set forth in Hudson v. McMillian, 503 U.S. 1 (1992). That is, to inquire "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 7 (citing Whitley v. Albers, 475 U.S. 312 (1986)); see also Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (per curiam).

10.    There are subjective and objective components of an Eighth Amendment violation.    "The objective component of an Eighth Amendment claim is therefore contextual and responsive to 'contemporary standards of decency.'" Hudson, 503 U.S. at 8 (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)).

11.    Factors to consider in determining whether excessive force was employed are:

    [T]he extent of injury suffered by an inmate is
    one factor that may suggest "whether the use of
    force could plausibly have been thought necessary"
    in a particular situation, "or instead evinced
    such wantonness with respect to the unjustified
    infliction of harm as is tantamount to a knowing
    willingness that it occur." [Whitley,] 475 U.S.,

at 321. In determining whether the use of force
was wanton and unnecessary, it may also be proper
to evaluate the need for application of force, the
relationship between that need and the amount of
force used, the threat "reasonably perceived by
the responsible officials," and "any efforts made
to temper the severity of a forceful response."
Ibid. The absence of serious injury is therefore
relevant to the Eighth Amendment inquiry, but does
not end it.

Id. at 7.

12. Plaintiff need not establish serious or

significant injury, provided that the amount of force used is

more than "de minimis" or involves force that is "repugnant to

the conscience of mankind." Id. at 9-10 (citation and quotation

marks omitted).

13. Based on the facts established by the testimonies

of Plaintiff, Nurse Camacho and Nurse Mori, and QMC's Emergency

Department medical records, [Tr. Exh. P-1,] the Court concludes

that Defendant did use force against Plaintiff on December 21,

2015, and that force was not applied "in a good-faith effort to

maintain or restore discipline" but was done "maliciously and

sadistically to cause harm." Further, the Court concludes that

Plaintiff's injuries – including a laceration on the left side of

his face, two subacute fractured ribs and inability to control

his movements or recall his name shortly after Defendant struck

him – are significant injuries, and were caused by Defendant

becoming angry and striking Plaintiff in response to Plaintiff's

disrespectful and profanity-ridden yelling at Defendant on at
least two occasions on December 21, 2015.

14.    Where a plaintiff alleges violation of both the
Eighth and Fourteenth Amendments for excessive use of force, the
Fourteenth Amendment offers no greater protection than the Eighth
Amendment:

> But we believe respondent did raise a claim that
> his "substantive rights under the Due Process
> Clause of the Fourteenth Amendment," <u>Youngberg v.</u>
> <u>Romeo</u>, 457 U.S. 307, 309 (1982), were infringed by
> prison officials when he was shot.  His complaint
> alleged violations of the Eighth and Fourteenth
> Amendments, and at argument on petitioners' motion
> for a directed verdict, counsel for both
> petitioners and respondents treated the Fourteenth
> Amendment as a distinct though overlapping source
> of substantive protection from state action
> involving excessive force.  Accordingly, we
> consider whether the Due Process Clause could
> serve as an alternative basis for affirmance.
>
> We need say little on this score.  **We
> think the Eighth Amendment, which is
> specifically concerned with the unnecessary
> and wanton infliction of pain in penal
> institutions, serves as the primary source of
> substantive protection to convicted prisoners
> in cases such as this one, where the
> deliberate use of force is challenged as
> excessive and unjustified.**  It would indeed
> be surprising if, in the context of forceful
> prison security measures, "conduct that
> shocks the conscience" or "afford[s]
> brutality the cloak of law," and so violates
> the Fourteenth Amendment, <u>Rochin v.</u>
> <u>California</u>, 342 U.S. 165, 172, 173 (1952),
> were not also punishment "inconsistent with
> contemporary standards of decency" and
> "'repugnant to the conscience of mankind,'"
> <u>Estelle v. Gamble</u>, 429 U.S., at 103, 106, in
> violation of the Eighth.  We only recently

> reserved the general question "whether
> something less than intentional conduct, such
> as recklessness or 'gross negligence,' is
> enough to trigger the protections of the Due
> Process Clause." Daniels v. Williams, 474
> U.S. 327, 334, n.3 (1986). Because this case
> involves prison inmates rather than pretrial
> detainees or persons enjoying unrestricted
> liberty we imply nothing as to the proper
> answer to that question outside the prison
> security context by holding, as we do, that
> **in these circumstances the Due Process Clause
> affords respondent no greater protection than
> does the Cruel and Unusual Punishments
> Clause.**

Whitley v. Albers, 475 U.S. 312, 326–27 (1986) (alteration in

Whitley) (emphases added) (some citations omitted).

15.  Violations of the Eighth Amendment are applicable

to state actors by the Fourteenth Amendment.  Estelle, 429 U.S.

at 101 ("The gravamen of respondent's § 1983 complaint is that

petitioners have subjected him to cruel and unusual punishment in

violation of the Eighth Amendment, made applicable to the States

by the Fourteenth.").

16.  The Court concludes that Plaintiff met his burden

of proof by a preponderance of the evidence and thus prevails as

to his claim of excessive force in violation of the Eighth and

Fourteenth Amendments (Count II).

17.  For Plaintiff's state law claim of battery

(Count III), "[a] person commits the common law tort of battery

if he or she acts with intent to cause a nonconsensual harmful or

offensive contact, or apprehension thereof, and the contact

27

occurs." <u>McCormack</u>, 762 F. Supp. 2d at 1253 (citing <u>Mukaida v.</u> <u>Hawaii</u>, 159 F. Supp. 2d 1211, 1223 (D. Haw. 2001); <u>Williams v.</u> <u>Aona</u>, 121 Hawai`i 1, 13, 210 P.3d 501, 513 (2009)).

18. Based on the facts established by the testimonies of Plaintiff, Nurse Camacho and Nurse Mori, and QMC's Emergency Department medical records, [Tr. Exh. P-1,] the Court concludes that Defendant intended to and did use force against Plaintiff on December 21, 2015 by striking Plaintiff. Further, the Court concludes that Plaintiff's injuries – including a laceration on the left side of his face, two subacute fractured ribs and inability to control his movements or recall his name shortly after Defendant struck him – are significant injuries, and were caused by Defendant becoming angry and striking Plaintiff in response to Plaintiff's disrespectful and profanity-ridden yelling at Defendant on at least two occasions on December 21, 2015.

19. The Court concludes that Plaintiff met his burden of proof by a preponderance of the evidence and thus prevails as to his claim of battery (Count III).

20. The elements of Plaintiff's claim of gross negligence (which is alleged as a part of Count IV) are:

> Gross negligence, on the other hand, is a step below willful misconduct. In a dissenting opinion in the <u>Iddings</u> case, Justice Ramil quotes a commonly accepted definition of gross negligence:

[Gross negligence includes i]ndifference to
[a] present legal duty and . . . utter
forgetfulness of legal obligations so far as
other persons may be affected.  It is a
heedless and palpable violation of [a] legal
duty respecting the rights of others.  **The
element of culpability [that] characterizes
all negligence is in gross negligence
magnified to a high degree as compared with
that present in ordinary negligence.**  Gross
negligence is a manifestly smaller amount[]
of watchfulness and circumspection than the
circumstances require of a person of ordinary
prudence.  **But it is something less than
willful, wanton and reckless conduct.**

Id. at 23, 919 P.2d at 285 (Ramil, J., dissenting)
(quoting Altman v. Aronson, 231 Mass. 588, 121
N.E. 505, 506 (1919)). . . .

Pancakes of Haw., Inc. v. Pomare Props. Corp., 85 Hawai`i 286,

293, 944 P.2d 83, 90 (Ct. App. 1997) (alterations in Pancakes of

Haw.) (emphases added).

21.   The elements of Plaintiff's willful and wanton

conduct claim (which is alleged as a part of Count IV):

The term "willful and wanton misconduct" is
defined in pertinent part as "[c]onduct which is
**either** intentional **or committed under
circumstances exhibiting a reckless disregard for
the safety of others**[.]"  *Black's Law Dictionary*
1600 (6th ed. 1990) (emphasis added and citation
omitted).  "Willful" is defined in pertinent part
as "[p]remeditated; malicious; done with evil
intent, or with a bad motive or purpose, **or with
indifference to the natural consequences**;
unlawful; without legal justification."  Id. at
1599 (emphasis added); see also Marshall v.
University of Hawai`i, 9 Haw. App. 21, 36 n.18,
821 P.2d 937, 946 n.18 (1991) (quoting identical
definition).  "Wanton" is defined in pertinent
part as "**[r]eckless, heedless**, malicious;
**characterized by extreme recklessness or**

29

**foolhardiness; recklessly disregardful of the
rights or safety of others or of consequences**."
Id. at 1582 (emphases added and citation omitted).

　　As is evident from the above-quoted
definitions, the plain meaning of the term "wilful
and wanton misconduct" encompasses both reckless
conduct that lacks a specific intent to cause
injury and intentional conduct motivated by a
specific intent to cause injury.

Iddings, 82 Hawai`i at 7, 919 P.2d at 269 (alterations and

emphases in Iddings) (interpreting words of Hawaii's workers

compensation statute using their common meaning).

　　22.　Defendant's assault and battery of Plaintiff took

place on December 21, 2015, when there was a special relationship

between Plaintiff, as an incarcerated person and Defendant, as an

ACO, and was done with "a bad motive or purpose, or with

indifference to the natural consequences," and thus was willful

conduct.　Given the special relationship between the parties

because of their respective status (that is, jailer and inmate),

Defendant's assault and battery of Plaintiff was "recklessly

disregardful of the rights or safety of others or of

consequences."　Therefore, the Court concludes that Plaintiff met

his burden of proof by clear and convincing evidence and thus

prevails as to his claim of wanton and willful conduct

(Count IV).　Because gross negligence is action which is greater

than ordinary negligence and less than willful and wanton

conduct, the Court concludes for the same reasons that Plaintiff

met his burden of proof by clear and convincing evidence and thus

Plaintiff prevails as to his claim of gross negligence (Count IV).

23.   Plaintiff, in Count V of his First Amended Complaint, seeks "an injunction enjoining the Warden from acquiescing in and implicitly allowing the use of excessive force against inmates at OCCC."  [First Amended Complaint at ¶ 33.]  As Plaintiff dismissed Defendant Segueira on May 31, 2018 and has not sought to add or substitute any official, the Court concludes that there is no party to the instant action against whom the relief sought in Count can be obtained.  Thus, if Count V was not dismissed upon the dismissal of Defendant Segueira, Plaintiff has failed to carry his burden of proof as to Count V.

## III.  **Damages**

1.   Plaintiff seeks an award of damages:

The law divides such "damages into two broad categories – general and special." <u>Ellis v. Crockett</u>, 51 Haw. 45, 50, 451 P.2d 814, 819 (1969).  General damages "encompass all the damages which naturally and necessarily result from a legal wrong done[,]" <u>id.</u>, and include such items as "pain and suffering, inconvenience, and loss of enjoyment which cannot be measured definitively in monetary terms." <u>Dunbar v. Thompson</u>, 79 Hawai`i 306, 315, 901 P.2d 1285, 1294 (App. 1995) (citation omitted).  Special damages are "the natural but not the necessary result of an alleged wrong[,]" <u>Ellis</u>, 51 Haw. at 50, 451 P.2d at 819, and are "often considered to be synonymous with pecuniary loss and include such items as medical and hospital expenses, loss of earnings, and diminished capacity." <u>Dunbar</u>, 79 Hawai`i at 315, 901 P.2d at 1294.

Bynum v. Magno, 106 Hawai`i 81, 85–86, 101 P.3d 1149, 1153–54 (2004) (alteration in Bynum).

      2.    Plaintiff has the burden of proving that Defendant's conduct was the legal cause of his injuries. Defendant's conduct is the legal cause of such harm if: "(a) [the actor's] conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his [or her] negligence has resulted in the harm." O'Grady v. State, 140 Hawai`i 36, 44, 398 P.3d 625, 633 (2017) (alterations in O'Grady) (citations omitted).

      3.    Proof of causation is likewise a required element of Plaintiff's § 1983 claim.  See Estate of Brooks ex rel. Brooks v. United States, 197 F.3d 1245, 1248 (9th Cir. 1999) ("[T]he element of causation is missing from the § 1983 claim, and dismissal with prejudice was proper.").

      4.    The Court concludes that Plaintiff has proven causation by a preponderance of the evidence that Defendant's use of excessive force, assault and battery, and gross negligence caused Plaintiff's physical injuries of loss of consciousness, laceration to forehead and two fractured ribs resulted in significant pain and suffering.

      5.    The Court concludes that an award of $5,000.00 for general damages to Plaintiff is appropriate in light of the

evidence in this case of Plaintiff's injuries, and pain and suffering.

6. Plaintiff has neither sought nor presented evidence of special damages, and the Court does not award special damages to Plaintiff.

7. Plaintiff seeks an award of punitive damages for which he has the burden of proving:

> by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences. Bright [v. Quinn, 20 Haw. 504 (1911)].

> Masaki v. General Motors Corp., 71 Haw. 1, 6–17, 780 P.2d 566, 570–75 (1989).

> Succinctly stated,

> [the] proper measure of punitive damages is (1) the degree of intentional, willful, wanton, oppressive, malicious or grossly negligent conduct that formed the basis for [the] prior award of damages against [the tortfeasor] and (2) the amount of money required to punish [the tortfeasor] considering [his or her] financial condition.

> Instruction No. 8.12, Hawai`i Civil Jury Instructions, 1999 edition; Kang [v. Harrington], 59 Haw. [652,] 660–61, 587 P.2d [285,] 291 [(1978)].

Kaopuiki v. Kealoha, 104 Hawai`i 241, 258, 87 P.3d 910, 927 (Ct. App. 2003) (some alterations in Kaopuiki) (footnote omitted).

8.   "Clear and convincing" evidence is greater than a preponderance of the evidence:

> Under Hawai`i law, "clear and convincing" evidence is "defined as an intermediate standard of proof greater than a preponderance of the evidence, but less than proof beyond a reasonable doubt required in criminal cases." <u>Masaki v. Gen. Motors Corp.</u>, 71 Haw. 1, 15, 780 P.2d 566, 574–75 (1989) (citing <u>Welton v. Gallagher</u>, 2 Haw. App. 242, 245–46, 630 P.2d 1077, 1081 (1981); <u>Bud Wolf Chevrolet, Inc. v. Robertson</u>, 519 N.E.2d 135, 138 (Ind. 1988); E. Cleary, *McCormick on Evidence*, § 340, at 959–60 (3d ed. 1984)); <u>see also Coyle v. Compton</u>, 85 Hawai`i 197, 940 P.2d 404 (App. 1997). This standard requires "that degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established, and requires the existence of a fact be highly probable." <u>Masaki</u>, 71 Haw. at 15, 780 P.2d at 574–75 (citations omitted).

<u>Tauese v. State, Dep't of Labor & Indus. Relations</u>, 113 Hawai`i 1, 35–36, 147 P.3d 785, 819–20 (2006).

9.   DPS and its employees have a special relationship with Plaintiff which required Defendant "to take reasonable steps to protect [Plaintiff] from unreasonable risk of physical harm":

> On the other hand, when the State has actually had custody of a person, such as a prisoner, we have held that the "[S]tate, by reason of the special relationship created by its **custody** of [the] prisoner, is under a duty to the prisoner to take reasonable action to protect the prisoner against unreasonable risk of physical harm." <u>Haworth v. State</u>, 60 Haw. 557, 563, 592 P.2d 820, 824 (1979) (citing in footnote 4, *inter alia*, Restatement (Second) of Torts § 314) (holding that the State's duty to exercise reasonable care for the safety of a prisoner continued during the prisoner's work assignment).

The duty arises out of the **deprivation** by the
state of the prisoner's normal **opportunities
to protect** himself, particularly through
places or situations which involve risk.
When the **custodial** authorities are charged
with knowledge that the prisoner may incur
harm unless preclusive measures are taken,
reasonable care must be exercised to prevent
such harm.

. . . Since the danger arose from the
exercise of the State's **authority** over
appellant as a prisoner, a duty to exercise
reasonable care to avoid the danger arose on
familiar tort principles.

Id. at 563–65, 592 P.2d at 824–25 (emphases
added).

Lee v. Corregedore, 83 Hawai`i 154, 159–60, 925 P.2d 324, 329–30

(1996) (alterations and emphases in Lee).

10.  Because of the government's obligation to care for

those it holds incarcerated, the Eighth Amendment proscribes

standards of decency which, when violated, are incompatible with

the values of society:

The Amendment embodies "broad and idealistic
concepts of dignity, civilized standards,
humanity, and decency . . . ," Jackson v.
Bishop, 404 F.2d 571, 579 (CA8 1968), against
which we must evaluate penal measures.  Thus,
we have held repugnant to the Eighth
Amendment punishments which are incompatible
with "the evolving standards of decency that
mark the progress of a maturing society."
Trop v. Dulles, 356 U.S. 86,] 101 [(1958)];
see also Gregg v. Georgia, [428 U.S. 153,]
172-173 [(1976)] (joint opinion); Weems v.
United States, . . . , 217 U.S. [349,] 378
(1910), or which "involve the unnecessary and
wanton infliction of pain," Gregg v. Georgia,
*supra*, at 173 (joint opinion); see also
Louisiana ex rel. Francis v. Resweber, 329

> U.S. 459, 463 (1947); <u>Wilkerson v.</u>
> <u>Utah</u>, . . . , 99 U.S. [130,] 136 [(1878)].

<u>Estelle</u>, 429 U.S. at 102–03 (some alterations in <u>Estelle</u>) (involving reliance on prison authorities for medical care).

    11.  The Court concludes that Plaintiff met his burden of proof by clear and convincing evidence that Defendant intentionally and maliciously committed assault and battery of Plaintiff, and his actions violated the standard of care to protect Plaintiff, as the prisoner, against "unreasonable risk of physical harm" and involved "the unnecessary and wanton infliction of pain." The Court thus concludes imposition of punitive damages is merited.

    12.  The amount of punitive damages imposed cannot be excessive and the Court must consider three guideposts:

> In light of these concerns, in <u>[BMW of North America v.] Gore</u>, [517 U.S. 559 (1996)], we instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. <u>Id.</u>, at 575. We reiterated the importance of these three guideposts in <u>Cooper Industries</u> and mandated appellate courts to conduct <i>de novo</i> review of a trial court's application of them to the jury's award. 532 U.S. 424 [(2001)]. Exacting appellate review ensures that an award of punitive damages is based upon an "'application of law, rather than a decisionmaker's caprice.'" <u>Id.</u>, at 436, (quoting <u>Gore</u>, <i>supra</i>, at 587 (Breyer, J., concurring)).

State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418
(2003).

13. Although courts are instructed to review all three
of the guideposts, the degree of reprehensibility is the most
important to consider:

> As for the degree of reprehensibility — "the
> most important indicium of the reasonableness of
> a punitive damages award," Gore, 517 U.S. at 576 —
> courts generally consider the financial
> vulnerability of the plaintiff, whether the harm
> was physical as opposed to economic, whether the
> defendant acted with indifference or a reckless
> disregard for the health and safety of others, and
> whether the harm was the result of intentional
> malice, trickery or deceit. State Farm, 538 U.S.
> at 419. . . .

Stockmar v. Colo. Sch. of Traditional Chinese Med., Inc., Civil
Action No. 13-cv-02906-CMA-MJW, 2015 WL 3568132, at *4 (D. Colo.
June 8, 2015).

14. After consideration of the three guideposts and
giving special care to the issue of reprehensibility, the Court
concludes that: (1) Defendant's use of excessive force in his
assault and battery of Plaintiff was unjustified and highly
reprehensible; (2) the harm to Plaintiff was to his physical
well-being (i.e., his loss of consciousness, laceration to his
forehead and two fractured ribs); (3) Defendant acted with
conscious disregard for Plaintiff's health and safety; and
(4) Defendant was motivated by malice.

15.  The Court concludes that an award of $25,000.00 in punitive damages to Plaintiff is appropriate in light of the evidence in this case of Defendant's reprehensible actions, malice and conscious disregard for Plaintiff's health and safety and the physical harm caused to Plaintiff.  Further, this amount reflects one-half of Defendant's gross financial earnings for 2015 (the year in which Defendant committed these acts).

## CONCLUSION

The foregoing is an outline of the Court's decision. The record citations were provided for ease of reference and are not intended to be exclusive.  Where there is a typographical or other error to, or omission of, the record citation, the parties should seek and annotate the relevant portion.  Plaintiff is instructed to prepare the proposed FOFCOL and to annotate the findings of fact to the portions of the record and the trial transcript that are consistent with the Court's Outline herein. Plaintiff shall prepare and file the proposed FOFCOL by no later than **October 19, 2018**, and Defendant shall prepare and file his objections to Plaintiff's proposed FOFCOL, if any, together with Defendant's proposed FOFCOL based on the Court's Outline, by no later than **October 31, 2018**.  The Court thereafter will issue its FOFCOL, Order and Judgment.  The parties are cautioned that they may not use their proposed FOFCOL to seek reconsideration of the Court's rulings set forth in this Outline.

In the event that the parties do not prepare and serve proposed FOFCOL as ordered, this Outline shall be deemed the Court's findings of fact and conclusions of law.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, September 28, 2018.



    /s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**THINH LUONG VS. PAT SOOALO, ET AL.**; CV 16-00613 LEK-KSC; OUTLINE OF DECISION